## BLACKWELL v. RYAN.

1. In suits for specific performance, the contract must be established by competent and satisfactory proof, such as is clear, definite, and certain. The Circuit judge sustained in his findings of fact.
2. A vendor has the right in equity to claim specific performance of a contract for the sale of land, and in such proceeding to have decree for payment of unpaid purchase money or a sale of the land therefor, but he is not entitled to recover rents and profits from the vendee.
3. To such an equitable proceeding, the statute of limitations as such has no proper application.
4. A subsequent agreement in this case between the vendee and the administrator of the vendor *held* not to have changed the relative condition of the parties.
5. One who goes into possession of land under a contract to purchase it, cannot acquire title against the vendor by the statute of limitations, until payment of the purchase money; neither can the widow of such vendee after his death.

6. Although there was in this case a positive and unequivocal assertion of adverse right made to the vendor by the widow of the vendee, still the bar of the statute cannot as such be interposed to a proceeding on the equity side of the court for specific performance of an executory contract.

7. But where, as in this case, there has been long and unexplained delay, the original parties are all dead, the widow of the vendee has been in uninterrupted possession for more than fourteen years asserting exclusive ownership, and other circumstances are adverse to the claim, a Court of Equity will not decree specific performance of. the contract in favor of the vendor.    The Court of Equity, in exercising discretion, will follow, as far as practicable, the analogies of the law.

Before FRASER, J., Edgefield, June, 1883.

The opinion fully states the case.    The Circuit decree, omitting such matters as are repeated in the opinion, was as follows:

Putting together the testimony of Mr. Griffin as to the admission of James Blackwell to him of the amount repaid to him by B. Jabez Ryan, the testimony of Mrs. Ryan, (somewhat indefinite it is true,) as to the amount paid on his bond out of her interest in the estate, real and personal, of John Dobey, and the fact that this agreement between Landon Tucker, the administrator of James Blackwell, and B. Jabez Ryan, carefully provided for the payment of the moneys paid by him on said bond, and that the same shall be first paid out of the sale of the hotel, and makes no mention of any amount due to his intestate's estate from payments made by him in his life-time, I must conclude that nothing remains unpaid by B. Jabez Ryan except the amount paid on the bond by Landon Tucker, $500 February 7th, 1860, and $2,000 July 7th, 1863, and the interest thereon.    The $500 payment was certainly not made with reference to Confederate money, as it was before the war.    The $2,000 was made on a bond executed long before the war, and extinguished it *pro tanto* at a specie valuation, and B. Jabez Ryan, in his agreement with Landon Tucker, never set up any such claim as that it was subject to be scaled.

The rental value of the property for 1868 to 1870 was about $300 per annum; from that time to the present about $200 per annum; but I do not think that the defendants are in any

event accountable for rent. The plaintiffs, if entitled to anything, have a right to the unpaid money and interest, and to have the land sold for the payment. They cannot have interest and rent both.

Mrs. Frances Ryan, the defendant, widow of B. Jabez Ryan, and her children, have been in the possession and in the receipts of the rents and profits ever since the death of her husband. If this was all, I would think that the plaintiffs would have a right to have the hotel and lot sold for the payment of the money paid out by Landon Tucker, and the interest, under the agreement between himself and B. Jabez Ryan, to be divided between Landon Tucker and the heirs of James Blackwell in such manner as they have seen fit to agree to amongst themselves. Soon, however, after the death of B. Jabez Ryan, some three months, Mrs. Ryan says in her testimony: "I had a conversation with Landon Tucker. He wanted me to sign an instrument of writing about this property. I told him it was my property, and that I would not leave it unless by fire or death."

An uncompleted contract to convey is an equitable mortgage. *Adams Eq.*, 123. The land becomes in equity the property of the vendee, and the purchase money that of the vendor. * * * On the death of the vendor, it will pass to his executor, for whom the devisee or heir will be a trustee. *Ibid*, 140, 141. If a man has entered into a valid contract for the purchase of land, he is treated in equity as the equitable owner of the land, and the vendor is treated as the owner of the money, and the purchase money is treated as the personal estate of the vendor, and goes as such to his personal representatives. 2 *Story Eq.*, § 790.

Landon Tucker, then, is the person who, either in his own right or as administrator, was competent to deal with the payment of it. He alone could give a valid receipt for the same, and he had a right to enforce this lien on the hotel and lot as in case of an ordinary mortgage, without making the personal representatives a party, and proceeding against the heirs alone, unless a decree is sought against the personal representatives. Mrs. Ryan and her children, in their answer, set up title in themselves and claim the benefit of the statute of limitations.

The Supreme Court of the United States liken the relations of

landlord and tenant to the relations of mortgagors and mortgagees, and consider that there is no more propriety in refusing a lessee, who has openly disavowed the title of the landlord, the protection of the statute, than there is any other fraudulent trustee, from the time the fraud is discovered.   There is no rule in law or equity which makes it a matter of duty to do so.   All the cases, however, show that every presumption is in favor of possession in subordination to the title of the true owner, and that the adverse possession must be made out, not by any inference, but by clear and positive 'proof of a claim on the part of the tenants and of an acquiescence 'on the part of the landlord who is knowing to the same.   *Ang. Lim.* (6 edit.), § 444, citing *Zeller* v. *Eckert,* 4 *How.,* 289.·

In the case referred to, the court seems to have been considering the case of a tenant and landlord, but says that they are like the relations of mortgagor and mortgagee, and thence deduces the principle which is applied to the former.   It seems to be a wholesome rule to be applied in all cases where parties occupy similar relations.   In the case of *Norton* v. *Lewis,* 3 *S. C.,* 31, the question of the right to set up the statute of limitations against a mortgage was reopened and the plea was not allowed in that case.   The Supreme Court in that case says that the defendants "do not allege anything in the character of their possession amounting to an active opposition to the claim of the mortgagee, but rely on the naked fact of holding · as purchasers under title derived from the mortgagor."   It is true that the court does not . say what would have been the effect of active opposition to the mortgagee, but enough is said to prevent that case from being an authority, that in no case can the statute of. limitations be set up against a mortgage.

In the case before me, Mrs. Ryan very emphatically claimed the property, and announced to the creditor her determination not to give it up, and that she claimed it as her own.   She has continued with her children in possession, and she is in the receipt of the rents and profits more than ten years consecutively immediately before the commencement of this action, February 27th, 1882.   Landon Tucker had a right then, early in 1868, under his agreement with B. Jabez Ryan, to the rents and profits of the

hotel and lot, and has allowed fourteen years to pass without taking any steps by law to assert his rights, and that, too, after he had been informed in a most positive manner by Mrs. Ryan that she claimed the hotel and lot as her own, and did not intend to leave it.   He could have forced a sale after January 1st, 1869.

The question is not here made as to the liability of Elbert Ryan as administrator of B. Jabez Ryan, and no judgment will be rendered upon it; but I think that the plea of the statute of limitations set up by the defendants against the sale of the house and lot to pay any alleged balance due to Landon Tucker, either immediately or as administrator of James Blackwell, deceased, must be sustained.   It is therefore ordered and adjudged that the complaint be dismissed.

*Messrs. W. T. Gary* and *Ernest Gary*, for appellants.

*Messrs. Butler & Simkins* and *Bettis & Wardlaw*, contra.

April 14th, 1884.   The opinion of the court was delivered by

MR. JUSTICE McGOWAN.   In November, 1856, the real estate of John Dobey, previously deceased intestate, was sold by the commissioner in equity for Edgefield district for partition under orders in the case of *John L. Dobey et al.* v. *Matilda Dobey et al.*   At this sale, B. Jabez Ryan bid off the Planters' Hotel at the price of $6,510, payable half in one year and the other half in two years; but he could not comply with the terms of sale, and his friend, James Blackwell, assumed the bid, gave bond with surety for the amount, and, as we suppose as a matter of course (although it is not expressly stated), took title from the commissioner.

At the time of the sale, or soon after, there was a written agreement entered into between Blackwell and Ryan that the latter should have the hotel if he would pay the bond given by Blackwell for the purchase money; and upon that being done, he, Blackwell, "would execute good and sufficient title to said hotel and premises unto the said Ryan."   This paper is lost; but as Ryan afterwards entered into another agreement, reciting the original contract, there seems to be no dispute about its terms.

Under this contract, Ryan took possession. Various payments were made on the Blackwell bond to the Dobey estate, as appears by receipts indorsed on it, but without stating from whom the money was received, down to the death of Blackwell, which occurred November 29, 1858; and immediately thereafter administration upon his estate was granted to Landon Tucker. Afterwards further payments were made on the bond, some by Ryan and others by Landon Tucker, the administrator of Blackwell, until July 7, 1863, when, there being due on the bond $2,000, this sum was paid by Landon Tucker, and the bond cancelled.

All this time Ryan and family were in possession of the hotel, and after the war, viz., on October 2, 1866, Ryan and Landon Tucker entered into a written covenant, under seal, which, after reciting the sale, &c., provided as follows: "And whereas the said James Blackwell, after his said purchase, by a certain instrument in writing, agreed with B. Jabez Ryan that if he, the said Ryan, would pay the said bond given by the said Blackwell to secure the purchase money of said hotel, that he, Blackwell, would execute good and sufficient titles to said premises unto the said B. Jabez Ryan; and whereas neither the said Blackwell, in his life-time, nor the said B. Jabez Ryan, paid the bond hereinabove referred to, but the same has been satisfied and paid by Landon Tucker, who has, therefore, become entitled to be subrogated to all the rights of the said James Blackwell in the premises, the said Jabez Ryan having paid a portion of the purchase money, and having an equitable claim therefor to have the agreement between Blackwell and himself specifically performed, but being anxious to secure the said Landon Tucker the amount paid by him upon the bond aforementioned: Now know all men by these presents that it is agreed by and between the parties thereto—that is to say, the said B. Jabez Ryan of the one part and the said Landon Tucker of the other part—as follows: That the said Landon Tucker shall have the control and management of said hotel from the first day of January, A. D. 1867, until the first day of January, A. D. 1869, and shall receive the rents and profits thereof until the latter date, at which time the said hotel and premises shall be sold, the proceeds of said sale to be first chargeable with the payment of that portion of the pur-

chase money paid by the said Landon Tucker, together with interest," &c.

It does not appear that this agreement was ever carried out; but Ryan remained in possession of the hotel until he died intestate in January, 1868. His family, consisting of his widow, Frances, and her children, Adela, wife of Frank Sandland, and defendants, Elbert Ryan and Alma Belanger, still continued to hold possession of the hotel. Letters of administration upon the estate of B. Jabez Ryan were never granted until March 2, 1882, when his said son, Elbert, became administrator. Things stood in this condition until February 27, 1882, when these proceedings were instituted by the heirs and administrator of James Blackwell against the heirs and administrator of B. Jabez Ryan, deceased, for specific performance of the contract of sale of the hotel. The defendants denied that there was anything due on the purchase money; but if so, they insisted that the plaintiffs were barred from prosecuting their action "by the statute of limitations, laches, and lapse of time."

There was no reference to ascertain how much, if anything, of the Dobey bond remained unrefunded, but Judge Fraser heard all the testimony and reached the conclusion of fact "that nothing remains unpaid except the amount paid on the bond by Landon Tucker, $500, February 7, 1860, and $2,000, July 7, 1863, in Confederate money." But he held further, as follows: "Mrs. Frances Ryan, widow of B. Jabez Ryan, and her children, have been in the possession of the rents and profits ever since the death of her husband. If this were all, I would think that the plaintiffs would have a right to have the hotel and lot sold for the payment of the money paid out by Landon Tucker. * * * Soon, however, after the death of B. Jabez Ryan, some three weeks, Mrs. Ryan says in her testimony: 'I had a conversation with Landon Tucker. He wanted me to sign an instrument of writing about this property. *I told him that it was my property, and that I would not leave it unless by fire or death.*' * * * I think that the plea of the statute of limitations set up by the defendants against the sale of the house and lot to pay any alleged balance due to Landon Tucker, either immediately or as admin-

istrator of James Blackwell, deceased, must be sustained; and the complaint is dismissed," &c.

From this decree, the plaintiffs appeal to this court upon the following exceptions:

1. "Because his honor erred in decreeing that nothing remains unpaid by B. Jabez Ryan except the amount paid on the bond by Landon Tucker, the proof showing that James Blackwell, in his life-time, made numerous large payments on said bond.

2. "Because his honor erred in deciding that the statement of Mrs. Ryan to Landon Tucker, to the effect 'that the property was hers, and that she would not leave it unless by fire or death,' was such a disclaimer of title in James Blackwell as would bind the heirs of James Blackwell and give currency to the statute of limitations.

3. "Because his honor erred in deciding that the plea of the statute of limitations, set up by defendants against the sale of the house and lot to pay any alleged balance due to Landon Tucker, either individually or as administrator of James Blackwell, must be sustained.

4. "Because his honor erred in not decreeing that the defendants were tenants at will of the heirs of James Blackwell, deceased, and could not hold the possession of said house and lot *adversely* to said heirs without first notifying said heirs of said intention.

5. "Because his honor erred in not deciding that the agreement between Landon Tucker and B. Jabez Ryan was an equitable mortgage of said hotel, which was pledged to secure the amount paid by Landon Tucker, as administrator of James Blackwell, on said bond.

6. "Because his honor erred in deciding that a mortgage could be barred by the statute of limitations in less than twenty years," &c.

The first question is one of fact—how much, if anything, is due upon the purchase money of hotel? In suits for the specific performance of contracts, the contract must be established by competent and satisfactory proof, *clear, definite, and certain.* The whole of the Dobey bond was certainly paid, but by whom is far from being clear. As to the first instalment paid to Com-

missioner Simkins, it is not stated by whom the payments were made, but as it does appear that during the time Ryan paid money directly to Blackwell, we infer that the payments were made by Blackwell himself. Upon this supposition, it is claimed that these payments were all refunded. It does not satisfactorily appear whether they were or not; but as nothing on that account was claimed to be due in the subsequent agreement of 1866, and the *onus* was upon the plaintiffs to prove their claim, we agree with the Circuit judge that it was not shown with sufficient clearness that any of the first instalment remains due and owing.

The second instalment of the bond fell due after the death of Blackwell, and was all paid to Commissioner Carwile by Ryan himself, except two payments by Tucker, administrator of Blackwell, viz., the first paid as administrator, $500, February 7, 1860, and the other as an individual, $2,000, in Confederate money, July 7, 1863, making $2,500. Is the whole of this sum, and if not, what part of it, still unrefunded? It appears that on May 9th, 1859, Ryan paid to Tucker the sum of $900, which would reduce the aggregate amount paid by him to $1,600; a sum less than that paid in Confederate money. Whether that $900 paid to Tucker was needed to refund the balance of payments made by his intestate, Blackwell, or should be credited on the above amount paid by himself, does not satisfactorily appear. The recitals in the agreement of 1866 unfortunately do not state the amount due to Tucker; but they favor the view that at least the last payment of $2,000 (which it seems was paid by him as an individual, and not as administrator) had not been refunded, for it is there stated as follows: "But the same (Dobey bond) has been satisfied and paid by Landon Tucker," &c. This would seem to point specially to the last payment, which satisfied the bond. But as in another place reference is made to "the amount paid by him upon the bond," without making any discrimination between the two payments, we concur, with some hesitation, with the Circuit judge in his finding that at the time of the execution of the agreement (1866) both the sums paid by Tucker, whether as an individual or as administrator of Blackwell, remained unpaid; and as no proof was made of payments after that time, that they still remain unpaid.

Then as to the right of the parties now to recover this balance. This is an action *for specific performance of a contract* for the sale of real estate, by which the vendee agreed to pay (without naming the time) a certain amount as purchase money (the Dobey bond), and the vendor agreed to make title when said purchase money was paid. This contract embodied mutual covenants, dependent one upon the other, and was, therefore, what is known as *an executory contract* as to land, which conferred upon the vendor what Herman and Jones and other elementary writers denominate "*a lien by contract* or reservation," as distinguished from the technical "vendor's lien," in which the title is conveyed to the vendee. "Before conveyance, however, and while there is a contract of sale merely, the vendor has the legal estate in the land, and the vendee has the equitable interest—the former being a trustee of the beneficial interest in the land for the latter; the latter being the trustee of the purchase money for the former." Whilst in this state we do not recognize the technical "vendor's lien," it is well settled that the vendor has a right, by a proceeding on the equity side of the court, to have such a contract for land specifically performed. *Gregorie* v. *Bulow*, *Rich. Eq. Cas.*, 245; *Walker & Trenholm* v. *Kee*, 16 *S. C.*, 76. The scope of the proceeding reaches only to the unpaid purchase money, if any; and if that is not paid, to have the land sold for the payment of it, so that rents and profits are not in the case. The defendants entered under a contract to purchase, and are entitled to the use and occupation until the time comes to get title from the vendor, or performance is decreed.

We agree with the appellant's counsel, upon the force of the authorities cited, that to such an equitable proceeding for specific performance the statute of limitations as such has no proper application. As was tersely said by Judge O'Neall, in the leading case of our State upon the subject, *Gregorie* v. *Bulow, supra:* "I concur fully with the chancellor that, either at law or equity, the statute of limitations could not be pleaded by the vendee against the vendor while the contract was executory on both parts." It seems that the authorities go so far as to hold that the nature of the contract remains unchanged even if the purchase money is put in the form of a note, which at law

would be barred; that either party would still have the equity to ask specific performance of the contract *taken as a whole* whenever he could show that he had fully performed, or was ready to perform, his part of it. "The agreement of the vendor substantially is this : when you pay the price you can have the title; till you pay, I retain it. The title is held as security for the price. The vendee cannot compel a conveyance until he pays the price; 'not even,' says the Supreme Court of Alabama, 'though the notes given for the price are barred by the statute of limitations, and no recovery at law can be had thereon.' " *Herm. Mort.*, § 211; *Driver* v. *Hudspeth*, 16 *Ala.*, 348; *Relfe* v. *Relfe*, 34 *Id.*, 500; *Hanna* v. *Wilson*, 3 *Grat.*, 232.

So far as the rights of the vendee are concerned, we do not see that it makes any difference whether the money was paid by Tucker as an individual or as administrator. We think it must be considered that he paid it as administrator out of the assets of the estate of his intestate. One of the receipts so states, but the other does not. He had, however, no connection with the matter, or right to meddle with it, except as administrator of Blackwell, whose bond was outstanding and about to be sued. But considered in either way, it comes to the same thing. If paid out of the assets of the estate, of course it was for the benefit of the heirs of Blackwell. If Tucker as an individual advanced the money for the estate of Blackwell, he thereby acquired *pro tanto* the original contract of Ryan to pay the purchase money, and all the rights connected with it; and thereafter the heirs of Blackwell held the legal title as trustees for him as the owner of the balance of the original obligation ; or as it was well expressed in the agreement of October, 1866, Tucker was "entitled to be subrogated to all the rights of the said James Blackwell in the premises." *Walker & Trenholm* v. *Kee*, 16 *S. C.*, 76; 1 *Jones Mort.*, § 235. Events changed the parties who have a right to enforce it, but the contract itself remains unchanged in character, being still *executory*. "In no case can a sale of lands be regarded as complete until the purchaser has paid his money and the seller has conveyed the land." *Herbemont* v. *Sharp*, 2 *McC.*, 264; *Buckner* v. *Railroad Company*, 7 *S. C.*, 328; *Burris* v. *Gooch*, 5 *Rich.*, 5.

Nor do we think that the agreement of 1866 between Ryan and Tucker created any new obligation or changed the relative condition of the parties. That was simply a recital and acknowledgment of rights previously existing with an abortive attempt to close up the matter by sale of the hotel.

Then as to the other branch of the statute, that claiming title to the hotel by *adverse possession* for more than ten years. It is a familiar doctrine that one who goes into possession of land under a contract to purchase it, and has not paid the whole of the purchase money, cannot acquire title against the vendor by the statute of limitations. *Richards* v. *McKie, Harp. Eq.,* 190; *Secrest* v. *McKenna,* 6 *Rich. Eq.,* 72; *Milhouse* v. *Patrick,* 6 *Rich.,* 352; *Gregorie* v. *Bulow, supra.* Ryan entered into possession under such a contract, and in 1866, a short time before his death, admitted that the whole of the purchase money had not been paid. It is clear, therefore, that if he were living and the defendant here, he would not be heard to say that he held the hotel adversely to the heirs and representative of his vendor.

But it is urged that the case is different as to such claim on the part of his widow, who has been in possession ever since his death, and that possession was made adverse by her declaration to Tucker soon after her husband's death in 1868, that "the hotel was *her property, and she would not leave it unless by fire or death.*" Mrs. Ryan went into possession with her husband, and must be considered to have done so on the terms and conditions upon which he received it. "When there is no new entry but the heir is in as of his ancestor's possession, the possession of the heir is that of the ancestor." *Reeder & Davis* v. *Dargan,* 15 *S. C.,* 182, and authorities there cited.

Assuming then that Mrs. Ryan was in possession under the contract of her husband to purchase as his privy, and that all of the purchase money had not been paid, was her declaration to Tucker, the representative of the vendor, "that the property was hers, and that she would not leave it unless by fire or death," enough to change the character of her possession, so as to put the statute to running in her favor, as against the vendor or his representatives? Her declaration was certainly a very positive and unequivocal assertion of adverse right, and it is difficult to un-

derstand how Tucker, who controverted it, could have acquiesced in it and taken no steps to enforce his claim for more than ten years, unless upon the supposition that, originating for the most part in Confederate money, he was conscious that, in justice, it was at least doubtful.

It is undoubtedly true that ten years adverse possession gives title against all who are capable of suing and do not.; but it seems to us that the legal bar of the statute cannot as such be interposed to a proceeding on the equity side of the court for the specific performance of an executory contract. See *Smith* v. *Smith*, *McMull Eq.*, 134, where Chancellor Dunkin said: "The remedy which complainant seeks [specific performance] is purely of an equitable character. * * * How far and in what manner this court [equity] is governed by the statute of limitations, has been often discussed. It is well stated by Lord Redesdale, in *Bond* v. *Hopkins*, 1 *Sch. & Lef.*, 428. 'The statute of limitations does not apply in terms to proceedings in courts of equity. It applies to particular actions at common law, and limits the time within which they shall be brought according to the nature of these actions, but it does not say that there shall be no recovery in any other mode of proceeding. Nothing is better established in courts of equity than that where a title exists in conscience, though there be none at law, relief should, though in a different mode, be given in equity.' " &c.

But from the fact that the legal bar of the statute as such is not applicable to an equitable proceeding for specific performance, it does not necessarily follow that a court of equity will in all cases grant the relief prayed for. Judge Story says: " The interference of courts of equity in decreeing specific performance is discretionary, and they will not interfere to decree specific performance, except in cases where it would be strictly equitable to make such a decree. There is no pretence to say that it is the doctrine of courts of equity to carry into specific execution every contract in all cases. * * * In general it may be stated, that to entitle a party to a specific performance, he must show that he has been in no default in not having performed the agreement, and that he has taken all proper steps towards the performance on his own part. If he has been guilty of gross laches, or if he

applies for relief after a long lapse of time, unexplained by equitable circumstances, his bill will be dismissed; for courts of equity do not, any more than courts of law, administer relief to the gross negligence of suitors. * * * It should be clear that there has been no change of circumstances affecting the character or justice of the contract, that he who asks a specific performance is in a condition to perform his own part of the contract, and that he has shown himself *ready, desirous, prompt,* and *eager* to perform the contract." 2 *Story Eq. Jur.,* §§ 749, 771, 776.

The same doctrine is announced and the authorities collected in 6 *Waits A. & D.,* 810. "It is the doctrine of equity that specific performance will not be decreed in favor of a complainant who has been guilty of *laches,* either in performing his part of the contract or in applying to a court for relief." We may add the authority of our own case of *Gregorie* v. *Bulow, supra,* in which stress is laid on the depreciation of the value of the property to the injury of the party sought to be charged, and the remark of Mr. Maddox is cited with approbation. "Where a contract has long lain dormant, thirteen years for instance, a specific performance has been refused; and *laches* of much less continuance is sufficient to dissolve the contract."

Now let us apply these principles to this case. The contract of Ryan to pay the Dobey bond was made about 1856. On July 7, 1863, when the last payment was made and the bond satisfied, the amount not paid by him was balance of purchase money then due, and the right of Tucker, the administrator of Blackwell, to demand specific performance was as perfect then as it is now; but we hear of no effort to enforce payment, except the abortive agreement of 1866, until February 27, 1882, when this action was commenced, a period of nearly nineteen years. It is true that the last payment on the Dobey bond was made in the midst of the war, when the courts were disorganized, but if we move up the transaction to October 2, 1866, when the agreement was executed, that was nearly sixteen years; and if we pass by the date of that acknowledgment, and count only from the time the attempted arrangement was to have been consummated, January 1, 1869, that was nearly fourteen years before action brought; and during the whole of this time Mrs. Ryan was in possession under the

very positive declaration·that she would yield to nothing but "fire or death."

After such a long and unexplained delay, can we say that the representatives of the deceased vendor were "ready, desirous, prompt, and eager to perform the contract"?    Would it be equitable now to grant specific performance of a contract made more than a quarter of a century ago by parties now dead, as to which the claim on one side, at least to the extent of four-fifths, originated in the use of Confederate money, and has been growing larger by the accumulation of interest, while on the other the property has been probably depreciating in value?    The exercise of undefined power is always embarrassing, and in order to restrict·it and introduce something like system, one of the rules laid down for directing the discretion of the court in such cases is to follow, as far as practicable, the analogies of the law.    As remarked by Chancellor Dunkin, in *Smith and Smith,* *supra*: "In regard to equitable titles, courts of equity are to be considered as affected only by analogy to the statute of limitations. If a party be guilty of such laches in prosecuting his equitable title as would bar him, if his title was solely at law, he shall be barred in equity."

We assume that the heirs of Blackwell, who hold the title of their ancestor as trustee for Tucker, the party beneficially interested, are ready and willing to make titles upon the payment of the balance of the purchase money to said Tucker; but under all the circumstances of the case we feel constrained to hold that the claim is stale, and that he has not shown himself entitled to the equitable relief which he asks.

The judgment of this court is that the judgment of the Circuit Court be affirmed.